IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| ALLEN TEMPLE COMMUNITY ECONOMIC DEVELOPMENT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDRIA NICOL RIVERA; ARGM GLOBAL, LLC; CITIBANK, N.A.; COMMUNITY FEDERAL SAVINGS BANK; FORIS DAX, INC. d/b/a CRYPTO.COM; and CROSS RIVER BANK,<br><br>Defendants. | Civil Action No. 6:25-cv-12713-TMC-TER |

**RESPONSE IN OPPOSITION TO FORIS DAX, INC., D/B/A CRYPTO.COM'S MOTION TO DISMISS**

Plaintiff, Allen Temple Community Economic Development Corporation ("Plaintiff" or "ATCEDC"), submits the following Response in Opposition to Foris DAX, Inc. d/b/a Crypto.com ("Defendant" or "Crypto") Motion to Dismiss First Amended Complaint ("Motion to Dismiss") (Docket Entry No. 63).

## I. INTRODUCTION

This case involves an oft-repeated scenario: a criminal committing fraud through the use of false bank accounts, stealing funds from actual customer accounts, and the banks and financial institutions through which those funds are stolen failing to accept any responsibility for their lack of security measures. Crypto, through its Motion to Dismiss, claims no liability for its failure to

follow its own security protocols, enabling a pattern of fraud that exceeded a year in length.

Crypto is incorrect, and its Motion to Dismiss should be denied.

## II. FACTS IN THE AMENDED COMPLAINT

As stated in the First Amended Complaint ("the Complaint"), Plaintiff is a South Carolina non-profit corporation that provides affordable housing to numerous low-income families in the Greenville, South Carolina area. Comp., ¶¶ 1, 11. Crypto is a corporation registered as a "money services business" with the Financial Crimes Enforcement Network, with a principal U.S. address in Miami, Florida. Comp., ¶ 6. During that time, Plaintiff had executed only one (1) wire transfer. Comp., ¶ 11.

Plaintiff held a mortgage loan with Greenville Housing Fund ("GHF") which was secured by residential rental properties, which Plaintiff decided to pay off in full. Comp., ¶ 12. On August 6, 2025, Plaintiff requested payoff and wiring instructions from GHF. Comp., ¶ 13. Two days later, Plaintiff received what appeared to be legitimate payoff and wiring instructions in PDF format from GHF. Comp., ¶ 14.

Defendants had unlawfully accessed, intercepted, and modified the email communications between Plaintiff and GHF, and substituted fraudulent wiring and payoff instructions to Plaintiff, directing payment to an account controlled by Defendant ARGM Global, LLC, a newly formed shell limited liability company held by Defendant Rivera. Comp., ¶ 15. The fraudulent account was a Citibank CitiBusiness checking account. *Id.*

The fraudulent wiring instructions directed Plaintiff to wire the loan payoff funds to Citibank, N.A. for the benefit of ARGM Global LLC. Comp., ¶ 16. Relying on those instructions, Plaintiff wired $310,583.74 to the ARGM Global Citibank account controlled by Defendant Rivera. Comp., ¶ 17. The Fedwire payment order transmitted to Citibank identified the beneficiary as "ARGM

GLOBAL LLC / GREENVILLE HOUSING FUND, 1615 WADE HAMPTON BLVD STE A, GREENVILLE SC 29609." Comp., ¶ 18. The payment order further explicitly stated that its purpose was to "PAYOFF LOAN GHF20190906." *Id.* Thus, the payment order clearly described a loan payoff amount to Greenville Housing Fund. *Id.*

Despite that express purpose and limitation, Plaintiff learned on August 14, 2025 from GHF that GHF had not received any funds and that the wiring instructions were fraudulent. Comp., ¶ 19. Plaintiff immediately reported the fraud to the Greenville Police Department and the FBI. *Id.*

As a result of the fraud, Plaintiff suffered a loss in the amount of $310,583.74, which directly impacts Plaintiff's ability to carry out its mission of providing affordable housing to low-income families in the Greenville area. Comp., ¶ 20.

Plaintiff has learned that ARGM Global was formed on May 19, 2025, less than three months before it received the wire in the amount of $310,583.84 from Plaintiff. Comp., ¶ 21. According to Citibank's own records, the ARGM Global account carried a negative balance as of June 30, 2025, and a balance of only $88.94 on July 31, 2025, shortly before the fraudulent transaction. *Id.* Citibank's records identified Rivera as the 100% owner, sole member and only authorized signer on the account, and contained her name, date of birth, driver's license, Social Security number, address, email and phone number. Comp., ¶ 22. Citibank also held a personal checking account for Rivera linked to the same information and identifiers and customer identifications. Comp., ¶ 23.

Immediately after receiving the stolen funds in the amount of $310,583.74 on August 8, 2025, Rivera began transferring the stolen funds out of the Citibank ARGM Global account to her personal account also held at Citibank. Comp., ¶ 24.

Rivera opened an account at Crypto.com on August 5, 2024, just over a year prior to the fraud. Comp., ¶ 25. Community Federal Savings Bank ("CFSB") served as the program bank and charter

partner for Crypto. Comp., ¶ 5. When Crypto.com opened the account, its "Know Your Customer" identify verification system specifically detected a mismatch between the name on Rivera's government-issued identification document and the name she provided during the account registration. Comp., ¶ 27. In fact, Crypto.com's internal records at the time the account was opened carried an internal tag explicitly stating: "***bypass_doc_name_mismatched***". *Id.* Despite the clear indication in its own records that something was amiss, Crypto.com's records indicate that the mismatch was simply "bypassed" – as reflected by the tag – allowing it to carry on with the account regardless. *Id.*

Having full access to the Crypto.com account for over a year, Defendant Rivera transferred $17,400.00 of the stolen funds to that account on August 6, 2025. Comp., ¶¶ 26, 28. On August 12, 2025, Defendant Rivera wired an additional $95,000.00 to her Crypto.com account. Comp., ¶ 29. Crypto.com converted the full $112,400.00 to cryptocurrency and allowed the funds to be immediately withdrawn by Defendant Rivera. Comp., ¶¶ 28, 29. Crypto.com earned exchange-rate spreads and fee revenues from the conversion of the stolen funds to cryptocurrency. Comp., ¶ 30.

On August 14, 2025, Citibank's "Wire Investigations Unit" emailed CFSB's fraud department and identified the two wire transfers as unauthorized, requesting CFSB to advise whether the funds were available for recall. Comp., ¶ 31. CFSB did not provide a substantive response to this email request for approximately five (5) months, waiting until January 5, 2026 to simply request more information about the transactions and the fraud, despite having almost five (5) months to conduct its own investigation. Comp., ¶ 32.

On August 15, 2025, Crypto.com took the completely useless step of suspending Rivera's account. Comp., ¶ 33. Of course, by that point, the entire $112,400.00 had been withdrawn. *Id.* Plaintiff has learned that Crypto.com's own records demonstrate that Rivera had consistently used

her Crypto.com account for over a year to receive numerous wire deposits and immediately convert the funds to Bitcoin or other cryptocurrencies. Comp., ¶ 34. The thirteen (13) month pattern of suspicious activity was never flagged or reported by Crypto.com or its banking partner, CFSB. *Id.*

When Citibank received Plaintiff's wire of $310,583.74 on August 8, 2025, it simply ignored the payment order's clear instructions that "GREENVILLE HOUSING FUND" was a payee. Comp., ¶ 36. It further ignored the stated purpose to "PAYOFF LOAN GHF20190906." *Id.* Citbank's records identified Defendant Rivera as the owner and holder of the ARGM GLOBAL LLC account, with no affiliation to GREENVILLE HOUSING FUND. Comp., ¶ 37.

The identification of both GREENVILLE HOUSING FUND and ARGM GLOBAL LLC, coupled with the clear purpose of the payment order placed Citibank on notice that the names of the intended beneficiaries were different persons. Comp., ¶ 38. Nonetheless, Citibank processed the payment order, providing the funds to ARGM GLOBAL LLC alone, completely disregarding the fact that Greenville Housing Fund was included as an additional payee. Comp., ¶ 39. This caused direct harm to Plaintiff. Comp., ¶ 40.

In the Complaint, Plaintiff has stated the following claims against Crypto.com: 1) violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"); 2) conversion; 3) unjust enrichment; and 4) constructive trust. Crypto.com has moved to dismiss each of those counts. This Court should deny the Motion to Dismiss for the reasons discussed below.

## III. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests

surrounding the facts, the merits of a claim, or the applicability of defenses"). To be legally sufficient a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

A motion to dismiss under Rule 12(b)(6) for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support her claim and would entitle her to relief. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999); *Mylan Labs., Inc.*, 7 F.3d at 1134. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court must treat factual allegations of the nonmoving party as true. *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 217-18 (4th Cir. 1994).

## IV. ARGUMENT

### A. PLAINTIFF HAS STATED A CLAIM FOR VIOLATION OF S.C. CODE § 39-5-10, *et seq.*

Defendant begins its argument by stating that Plaintiff failed to state a claim under SCUTPA. Defendant is incorrect, and the motion to dismiss the Second Cause of Action should be denied.

Unfair and deceptive acts are unlawful. S.C. Code §39-5-20. "A trade practice is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive; a practice is 'deceptive' when it has a tendency to deceive." *Young v. Century Lincoln-Mercury, Inc.,* 396

S.E.2d 105, 302 S.C. 320 (Ct. App. 1989).

To be actionable under the UTPA, the unfair or deceptive act or practice must have an impact upon the public interest. *Haley Nursery Co. v. Forrest*, 298 S.C. 520, 381 S.E.2d 906 (1989). "An unfair or deceptive act or practice has an impact upon the public interest if the act or practice has the potential for repetition." *Id.* at 524, 381 S.E.2d at 908.

There are two general ways to demonstrate the potential for repetition: (1) by showing the same kind of actions occurred in the past, thus making it likely the actions will continue absent some deterrence, or (2) by showing the company's procedures create a potential for repetition of the unfair and deceptive acts. *Crary v. Djebelli,* 329 S.C. 385, 496 S.E.2d 21 (1998). These are not the only means of showing the potential for repetition, however, and each case must be evaluated on its own merits. *Daisy Outdoor Adver. Co. v. Abbott*, 322 S.C. 489, 497, 473 S.E.2d 47, 51 (1996).

Regarding SCUTPA, Plaintiff alleged that Crypto.com:

- Opened an account for Defendant Rivera on August 5, 2024, and specifically detected a mismatch between the name on Rivera's government issued identification document and the name provided during registration (Comp., ¶ 27);
- Created a procedure specifically designed to ignore such a mismatch, as reflected in its own records which contained the internal tag: "*bypass_doc_name_mismatched*" for Defendant Rivera's account (*Id.*);
- Converted the wire of $17,400.00 on August 6, 2025, and allowed the immediate withdrawal of those funds on August 7, 2025 (Comp., ¶ 28);
- Converted the wire of $95,000.00 on August 12, 2025, and allowed the immediate withdrawal of those funds within two hours of receipt (Comp., ¶ 29);

- Limited Defendant Rivera's account access on August 15, 2025, three days after the $95,000.00 wire had been converted, and after all of the funds had been withdrawn (Comp., ¶ 33); and
- Allowed the Rivera account to be used for consistent fraudulent activity from August 5, 2024 to August 12, 2025 despite clear indications that the activity was suspicious (Comp., ¶ 34).

Defendant argues that these allegations fail to state a claim under SCUTPA for three reasons: 1) Plaintiff failed to allege that Crypto.com engaged in an unlawful trade practice; 2) Plaintiff failed to plausibly allege damages caused by Crypto.com's conduct; and 3) Plaintiff failed to allege an adverse impact on the public interest.

**1. Plaintiff Alleged that Crypto.com Engaged in Unlawful Trade Practices.**

Here, Defendant relied heavily on a non-binding case: *Nauful v. Navy Fed. Credit Union*, No. 3:23-CV-02357-JDA, 2025 U.S. Dist. LEXIS 127018 (D.S.C. July 3, 2025). First, Defendant cites to *Nauful* for the uncontroversial statement that "an unfair trade practice has been defined as a practice which is offensive to public policy or which is immoral, unethical, or oppressive." *Id.* at *8. Plaintiff then cites *Nauful* for the irrelevant proposition that a financial institution's compliance with a customer's instructions, "even where the customer misrepresents the purpose of the transactions or the transactions later prove harmful", "cannot constitute unfair practices under the SCUTPA." *Nauful*, 2025 WL 1836702, at *11. Further, "it is not the law nor the public policy in South Carolina to require a financial institution to deny a [customer] access to her own funds." *Id.* at *10.

But Defendant wholly failed to explain the underlying facts in *Nauful*. There, the plaintiff's mother was an elderly customer with three accounts held by Navy Federal Credit Union. *Id.* at *2.

Plaintiff was added as a joint owner on all of the accounts in order to assist in paying bills and making transfers. *Id.*

Beginning on March 9, 2022 and for the next three (3) months, Ms. Nauful began making wire transfers and cash withdrawals totaling over $500,000.00. *Id.* at *3. Bank employees recognized the transactions as "suspicious" and "odd", and possibly indicative of elder abuse. *Id.* However, when they questioned their client, Ms. Nauful, about them, she "repeatedly disclosed that the transfers were for 'business transaction[s]' or to 'purchase antique furniture.'" *Id.* at *4. When plaintiff, Ms. Nauful's daughter, discovered that her mother was the victim of a scam, she requested Navy Federal to fully reimburse the amount of the withdrawn funds, but Navy Federal declined to do so. *Id.*

Among other claims, the plaintiff brought suit under SCUTPA. Discussing whether or not Navy Federal's actions constituted "unfair acts" under SCUTPA, Navy Federal argued that "it is not the law nor the public policy in South Carolina to 'require[] a financial institution to deny a lucid, independent senior citizen access to her own funds.'"[1] *Id.* at *10.

In fact, the *Nauful* case reflects action by a financial institution that was intended to *protect* its customer. When Navy Federal recognized potential red flags and fraud being carried out against its client, its employees consistently asked her about the transactions. Each time, Nauful lied about the transactions and insisted on withdrawing the funds. Navy Federal followed its own guidelines and banking laws in permitting its customer access to her own funds.

This is the complete opposite of what happened in this case. Here, Crypto.com specifically designed a process by which red flags could be "bypassed." It intentionally programmed such a

[1] In its Motion to Dismiss, Crypto.com attributed this quote to the *Nauful* court. The statement was actually made by Defendant Navy Federal in its motion to dismiss. However, the court did agree with it.

bypass into its computer systems, allowing accounts to be opened notwithstanding the name mismatch. Moreover, it failed to conduct any investigation of Defendant Rivera's account over a period of thirteen (13) months, despite clear evidence of consistent fraudulent activity.

Unlike in *Nauful* where the defendant attempted to protect its own client from fraud potentially being committed by outsiders, Crypto.com specifically *enabled* its client to conduct fraud on others. In other words, in *Nauful*, the bank's primary concern was that its own customer was being scammed, whereas Crypto.com could have – and should have – recognized that its customer was the scammer.

While *Nauful* is non-binding here, it is equally inapposite.

Defendant further argues that its KYC practices are merely regulatory obligations owed to government authorities, not to private third parties such as Plaintiff. However, Plaintiff's allegations do not rely on Defendant's failure to follow proper KYC policies. Instead, Plaintiff has alleged that Defendant intentionally created a bypass mechanism in order to avoid such policies in the first instance. This was an intentional act which is completely separate from its regulatory obligations and serves as the impetus for Plaintiff's claim.

The Court should deny the motion to dismiss on this basis.

**2. Plaintiff Alleged Damages Caused by Crypto.com's Conduct.**

Next, Defendant argues that Plaintiff has not alleged damages, because Plaintiff's damages had already occurred prior to the funds being paid into Defendant Rivera's Crypto.com account. According to Defendant, "Plaintiff's loss of $310,583.74 occurred when it wired those funds to the ARGM Global Citibank account on August 8, 2025 – well before any funds reached the Crypto.com platform." According to Defendant, then, Plaintiff is unable to establish a causal connection between its losses and any conduct of Crypto.com.

But what Defendant ignores is the method by which the fraud was carried out by its client, Defendant Rivera. Without having an account held by Crypto.com, Defendant Rivera would not have been able to complete her fraudulent scheme. Rivera needed a method by which she could immediately convert the cash funds she received into some other fungible asset and thereby conceal her fraudulent activity. She found a willing partner in Crypto.com, which created a system which intentionally bypassed safety and security measures. Crypto.com served as the conduit allowing the completion of the scam.

To the extent the Court determines that Plaintiff must allege more facts in support of causation, Plaintiff requests leave to amend.

**3. Plaintiff Alleged that Crypto.com's Conduct Had an Adverse Impact on the Public Interest.**

Finally, Crypto.com posits that Plaintiff has not alleged Crypto.com's conduct had an adverse impact on the public interest. Crypto.com complains that Plaintiff improperly "lump[s] together multiple defendants without identifying any specific policy, procedure, or practice attributable to Crypto.com that could give rise to repeated unlawful conduct."

Of course, that is simply not the case, as Plaintiff specifically identified Crypto.com's intentional conduct of creating a bypass mechanism to ignore name mismatches. That intentional conduct is directly attributed to Crypto.com, as opposed to "multiple defendants." Moreover, Plaintiff alleged that Crypto.com ignored clear red flags and fraudulent indicators over a thirteen (13) month period in Defendant Rivera's account. Again, this conduct was Crypto.com's alone. And by creating such a programming bypass and ignoring the clear fraudulent activity, Crypto.com not only created the *potential* for repetition, but it also actually created the repetition itself.

Defendant once again relies on a non-binding case: *Ethox Chemical, LLC v. Coca-Cola*

*Co.*, No. 6:12-CV-01682-TMC, 2013 U.S. Dist. LEXIS 870 (D.S.C. Jan. 3, 2013). Claiming that Plaintiff's allegations here "mirror those rejected in *Ethox*", Defendant noted that the court there dismissed a SCUTPA claim "based on similarly generalized assertions that the defendant's conduct could recur, explaining that 'even if [defendant] has been accused of similar past violations, … allegations of accusations are not the same as allegations of specific similar past acts.'" *Id.*

Specifically, the plaintiff in *Ethox Chemical* alleged:

> This case does not represent the first instance in which Coca-Cola has been accused of engaging in unfair methods of competition and deceptive business practices. Without Court intervention, there is a legitimate threat that Coca-Cola will continue to engage in unfair practices and repeat its deceptive business practices, and, as a result, Coca-Cola's actions adversely affect the public interest.

*Id.* at *8. The *Ethox Chemical* court stated that "allegations of accusations are not the same as allegations of specific similar past acts. Similarly, the complaint fails to allege any specific procedures or business practices that create the potential for repetition." *Id.* at *8.

Here, despite Defendant's claim that the allegations failed to identify any specific procedures or business practices that create the potential for repetition, Plaintiff alleged that Crypto.com intentionally created its own bypass procedures which were specifically designed to ignore clear warning signs such as name mismatches. And Crypto.com ignored thirteen (13) months of red flags and signs of fraud in the Rivera account, enabling her to continue committing fraud against other individuals, and eventually against Plaintiff. Each of these actions constitute specific procedures and business practices which not only create the *potential* for repetition, but *actual* repetition.

The Court should deny the motion to dismiss the SCUTPA claim.

**B. PLAINTIFF WITHDRAWS ITS CLAIM FOR CONVERSION.**

Consistent with the position Plaintiff has taken with respect to similarly situated receiving-bank defendants in this action, and in light of authority holding that "fraudulently obtained funds are converted by the fraudster, not his bank," Song Chuan Tech. (Fujian) Co. v. Bank of Am., NA, No. CV 2:16-3269-RMG, 2017 WL 980248, at *2 (D.S.C. Mar. 10, 2017), Plaintiff withdraws its conversion claim against Cross River at this time.

**C. PLAINTIFF HAS STATED A CLAIM FOR UNJUST ENRICHMENT.**

Next, Defendant argues that Plaintiff failed to state a claim for unjust enrichment. Defendant is incorrect.

"A party may be unjustly enriched when it has and retains benefits or money which in justice and equity belong to another." *Inglese v. Beal*, 403 S.C. 290, 297 (Ct. App. 2013) (citing *Dema v. Tenet Physician Servs.-Hilton Head, Inc.*, 383 S.C. 115, 123, 678 S.E.2d 430, 434 (2009)). "The remedy for unjust enrichment is restitution." *Id*. (citing *Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 409, 581 S.E.2d 161, 167 (2003)).

"Unjust enrichment is an equitable doctrine which permits the recovery of that amount the defendant has been unjustly enriched at the expense of the plaintiff." *T-Zone Health, Inc. v. SouthStar Cap., LLC*, No. 2:20-cv-02519-DCN, 2024 U.S. Dist. LEXIS 190381, at * 24-25 (D.S.C. Aug. 29, 2024) (citing *Dema v. Tenet Physician Servs.-Hilton Head, Inc.*, 383 S.C. 115, 678 S.E.2d 430, 434 (S.C. 2009)). "To succeed on an unjust enrichment claim, a plaintiff must prove: "(1) [a] benefit conferred by plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value." *Id.*, at * 25-26 (citing *Myrtle Beach Hosp., Inc. v. City*

*of Myrtle Beach*, 341 S.C. 1, 532 S.E.2d 868, 872 (S.C. 2000))."

Defendant primarily relies on the notion that Plaintiff did not confer a benefit upon Crypto.com because there was no relationship between the parties. But as discussed above, unjust enrichment can also be shown when one party retains benefits or money which in justice and equity belong to another. Here, Plaintiff has alleged that Crypto.com was enriched by receiving and retaining the benefit of Plaintiff's stolen funds and the revenue derived from those funds. (Comp., ¶ 65). Further, Plaintiff alleged that Crypto.com's retention of the revenue from the funds without paying restitution to Plaintiff is unjust. *Id*. Plaintiff alleged that Crypto.com retained fees, spreads or other financial benefits associated with the stolen funds, along with exchange fees, account-related charges, or other transaction-based revenue.

To the extent the Court finds these allegations insufficient to state a claim of unjust enrichment, Plaintiff requests leave to amend.

**D. PLAINTIFF HAS STATED A CLAIM FOR CONSTRUCTIVE TRUST.**

Finally, Defendant requests dismissal of the claim for constructive trust, claiming that a constructive trust is a request for equitable relief "untethered to any viable claim or factual basis."

"A constructive trust is distinguished from an express trust in that the former arises entirely by operation of law without reference to any actual or supposed intention of creating a trust. It is resorted to by equity to vindicate right and justice or frustrate fraud." *Whitmire v. Adams*, 273 S.C. 453, 457 (1979) (citing *All v. Prillaman*, 200 S.C. 279, 20 S.E. (2d) 741 (1942)). "Generally, fraud is an essential element, but it need not be actual fraud. The case of *Bank of Williston v. Alderman*, 106 S.C. 386, 91 S.E. 296, 298 (1917) states: 'Actual fraud is not necessary, but such trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by him who holds the legal title.'" *Id*. (*see also Dominick v. Rhodes*, 202

S.C. 139, 24 S.E. (2d) 168 (1943)).

Plaintiff alleged that Crypto.com holds legal title to funds or assets which are traceable to Plaintiff's stolen funds, or to proceeds derived from those funds. (Comp., ¶ 74). Plaintiff alleged that it would be inequitable for Crypto.com to retain those funds or the benefits derived from them. (Comp., ¶ 75).

Defendant argues that any funds or benefits derived from them are not traceable "to any specific, identifiable res in Crypto.com's possession." However, that is a question of fact yet to be determined. No discovery has been completed at this point. Consequently, it is not yet known whether the proceeds or funds are traceable to assets currently held by Crypto.com.

The motion to dismiss Plaintiff's claim of constructive trust should be denied.

## CONCLUSION

For the reasons outlined above, this Court should deny Defendant's Motion to Dismiss in its entirety.

Respectfully Submitted,

DAVE MAXFIELD, ATTORNEY, LLC

s/ David A. Maxfield

Dave Maxfield, Esq., FED ID 6293
P.O. Box 11865
Columbia, SC 29211
(803) 509-6800
(855) 299-1656 (fax)
dave@consumerlawsc.com

July 15, 2026